**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

USDC SDNY
DOCUMENT ELECTRONICALLY
FILED
DOC#: _____
DATE FILED: 3-29-19

RAFAEL APARICIO,

                **Plaintiff**

      -v.-

CHRISTIAN UNION, INC.,

MATT BENNETT,

                **Defendants**

**18-CV-0592 (ALC)**

**OPINION AND ORDER**

**ANDREW L. CARTER, JR., United States District Judge:**

      Rafael Aparicio ("Plaintiff") brings this action, *pro se*, against Christian Union, Inc.

("CUI") and Matt Bennett ("Bennett") (collectively, "Defendants") under Title VII of the Civil

Rights Act of 1964, 42 U.S.C. §§ 2000e et seq. ("Title VII"), New York State Human Rights

Law, N.Y. Exec. L. §§ 290 et seq. ("NYSHRL"), and the New York City Human Rights Law,

N.Y.C. Admin. Code §§ 8-101 et seq. ("NYCHRL") alleging employment discrimination and

retaliation. Plaintiff also asserts New York state law claims for breach of contract, unlawfully

withholding vacation pay, slander, and libel. Defendants now move to dismiss all of Plaintiff's

claims pursuant to Fed. R. Civ. P. 12(b)(6). For the following reasons, Defendants' Motion to

Dismiss is **GRANTED**.

## BACKGROUND[1]

### I.     Factual Background

---

[1] All facts derive from Plaintiff's Complaint and are presumed true for the purposes of this motion.

**COPIES MAILED**

CUI is a Non-Profit organization, founded by their CEO Matt Bennet, that funds and operates student leadership organizations at Ivy League universities. Compl., ¶4. On November 15, 2013, Plaintiff began working at CUI as the Director of Public Affairs. *Id.*, ¶16. After a year, the Board of Trustees (the "Board") appointed Plaintiff to a task force to investigate an incident regarding another employee's refusal to implement an organization for black students at Princeton University. *Id.* at ¶ 20. This incident caused mistrust within the organization and donors began to withhold funds. *Id.* at ¶ 19. After interviewing employees about their organizational experiences and concerns, Plaintiff expressed his "good faith belief that CUI was breaking employment laws, as well as university policies" to the rest of the task force. *Id.* at ¶ 22. Specifically, Plaintiff complained about CUI's complementarian policy that denies women leadership positions in the organization.[2] *Id.*

As a result, Plaintiff alleges that Bennett contacted other task force members, Board members, the consultant on the task force project, and an employee representative to "criticize [Plaintiff's] involvement … and otherwise disparage him." *Id.* at ¶ 23. The task force finalized a report in June of 2015. The report was presented to the Board and management, but CUI made no policy changes. *Id.* at ¶ 24. CUI hired an additional consultant to investigate who later reported concerns regarding the complementarian policy. *Id.* at ¶ 25. Subsequently, Bennett ordered the task force to destroy the consultant's report. *Id.* Throughout June and July of 2015, Plaintiff routinely reported complaints from donors Emily and Ross Jones regarding the complementarian policy and gender discrimination to management. *Id.* at ¶¶ 26-28.

In August of 2015, Defendants issued Plaintiff a Disciplinary Notice addressing a lack of progress in generating revenue. *Id.* at ¶ 29. However, Plaintiff claims this allegation was plainly

---

[2] At the same time, he also shared employees' concerns regarding a racial segregation policy at Princeton. Compl. ¶ 22.

false since "[he] surpassed [his] annual fundraising targets in June 2014." *Id.* Plaintiff recognized that he was "below target" for 2015 but "no fundraiser met their targets because of the debacle at Princeton…" *Id.* Further, Plaintiff alleges that he was the only one of his peers to receive a Disciplinary Notice and Defendants did not have a formal performance evaluation process. *Id.* Plaintiff alleges that even though his supervisors described the Disciplinary Notice as "[in]significant", CUI circulated the disparaging letter to other employees and placed it in Plaintiff's personnel file. *Id.* at ¶ 30. Plaintiff went on to repeatedly air his concerns about the legality of the complementarian policy to the Board and Emily Jones' through October of 2015. *Id.* at ¶ 33. Thereafter, CUI banned Plaintiff from communicating with Emily Jones. *Id.*

Plaintiff then voiced his concern to his new supervisor—a consultant hired to oversee the fundraising group—Mark Dillon. *Id.* at ¶ 34-35. On December 10, 2015, Dillon and Lorri Bentch (Vice President of Operations) terminated Plaintiff without explanation. *Id.* at ¶ 38. *Id.* at ¶ 40. In a subsequent meeting, Bentch instructed CUI employees not to delete Plaintiff's emails, stating "we need to be careful." In the same meeting, Bennett proclaimed "Rafael is just after the money, he doesn't have a case, he had really bad performance and that's why we let him go." *Id.* at ¶ 41. Plaintiff believes he was fired for voicing his concerns on CUI's discriminatory employment policies. *Id.* at ¶ 47.

On July 1, 2016, Plaintiff filed a Charge of Discrimination with the EEOC charging Defendants with retaliation. ECF No. 1, Ex. 1. On August 23, 2017,the EEOC issued a Determination Letter with the following findings: 1) Plaintiff's expressed opposition to Defendants' gender-bias policy constituted protected activity; 2) Defendants' asserted defense lacked credibility; 3) uncontested evidence showed that underperforming employees who had not engaged in protected activity were not subject to discipline or termination; and 4) there was

reasonable cause to believe Defendants discriminated against Plaintiff for opposing its gender-bias policy. ECF No. 1, Ex. 2. The EEOC sent Plaintiff a letter dated October 25, 2017 as well as a Notice of Right to Sue, stating that conciliation efforts with Defendants were unsuccessful. *Id.*

## II.    Procedural History

On January 23, 2018, Plaintiff filed this action. ECF No.1. On February 13, 2018, Defendants sent a letter requesting a pre-motion conference to discuss Defendants' intention to file a motion to dismiss. Nos. 5, 7. Plaintiff did not respond. The Court denied the request for a pre-motion conference and set a briefing schedule. ECF No. 10. On May 9, 2018, Defendants filed a Motion to Dismiss pursuant to Fed. R. Civ. P. 12(b)(6). On June 1, 2018, the Court ordered Plaintiff to Show Cause as to why Defendants' Motion should not be deemed unopposed. ECF No. 18. Plaintiff responded to the Court's order on July 13, 2018 and the Court subsequently withdrew ECF No. 18 on September 3, 2018. ECF Nos. 20, 21. Plaintiff's response serves as his opposition to Defendants' motion to dismiss.

## STANDARD OF REVIEW

To withstand a motion to dismiss, a complaint must contain "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). The complaint "need not include detailed factual allegations, but must contain sufficient factual matter ... to state a claim to relief that is plausible on its face." *Corona Realty Holding, LLC, v. Town of N. Hempstead*, 382 F. App'x 70, 71 (2d Cir. 2010) (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)). Furthermore, "a well-pleaded complaint may proceed even if it appears 'that a recovery is very remote and unlikely." *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 556 (2007) (quoting *Scheuer v. Rhodes* 416 U.S. 232, 236 (1974)). However, reciting the elements of a cause of

action, "supported by mere conclusory statements," is not enough to show plausibility. *Hempstead, 382* F. App'x at 72.

The standard of review for 12(b)(1) motions is "substantively identical" to Rule 12(b)(6) motions. The key difference is that the movant bears the burden of proof on a 12(b)(6) motion but the plaintiff invoking the court's jurisdiction bears the burden on a 12(b)(1) motion. *See Lerner v. Fleet Bank, N.A.,* 318 F.3d 113, 128 (2d Cir. 2003). Additionally, to decide the motion, the court "may consider facts as asserted within the four corners of the complaint together with the documents attached to the complaint as exhibits, and any documents incorporated in the complaint by reference." *Peter F. Gaito Architecture, LLC v. Simone Dev. Corp.,* 602 F.3d 57, 64 (2d Cir. 2010) (internal quotation marks omitted).

"A case is properly dismissed for lack of subject matter jurisdiction under Rule 12(b)(1) when the district court lacks the statutory or constitutional power to adjudicate it." *Makarova v. United States,* 201 F.3d 110, 113 (2d Cir. 2000). When challenged, a plaintiff must prove subject matter jurisdiction exists by a preponderance of the evidence. *Id.* A court considering a motion to dismiss for lack of subject matter jurisdiction construes all ambiguities and draws all reasonable inferences in the plaintiff's favor. *Id.*

Considering these standards, "[a] document filed *pro se* is to be liberally construed, and a *pro se* complaint, however inartfully pleaded, must be held to less stringent standards than formal pleadings drafted by lawyers." *Erickson v. Pardus*, 551 U.S. 89, 94 (2007) (citation omitted). In particular, "the pleadings of a *pro se* plaintiff must be read liberally and should be interpreted to raise the strongest arguments that they suggest." *Graham v. Henderson*, 89 F.3d 75, 79 (2d Cir. 1996) (quoting *Burgos v. Hopkins*, 14 F.3d 787, 790 (2d Cir. 1994)).

**DISCUSSION**

## I. Plaintiff's Retaliation Claim Under Title VII

### A. Protected Activity

Title VII provides that, "[i]t shall be an unlawful employment practice for an employer to discriminate against any of his employees ... because he has opposed any practice made an unlawful employment practice by this subchapter[.]" 42 U.S.C. § 2000e-3(a). To state a prima facie case for retaliation under Title VII, a plaintiff must prove that: (1) they engaged in protected activity under Title VII; (2) the employer was aware of this activity; (3) the employer took adverse action against the plaintiff; and (4) a causal connection exists between the protected activity and the adverse action. *Kessler v. Westchester County Dept. of Social Servs.*, 461 F.3d 199 (2d Cir. 2006). To satisfy the protected activity requirement, a plaintiff must have an objective, good faith belief that the employer's policy they opposed violated Title VII. *Summa v. Hofstra University*, 708 F.3d 115 (2d Cir. 2013) (citing *Galdieri–Ambrosini v. Nat'l Realty & Dev. Corp.*, 136 F.3d 276, 292 (2d Cir.1998) (internal quotation marks omitted)).

Here, Plaintiff's Complaint includes multiple instances where he alerted the Board that he believed in good faith that CUI's complementarian policy was illegally discriminatory. Compl. ¶¶ 22-23. Nevertheless, a plaintiff-employee alleging employment discrimination under Title VII will be barred from bringing that claim against their employer if the employer qualifies as a religious organization and the plaintiff qualifies as a minister. This Title VII carve-out is referred to as the "ministerial exception".

### B. *Rweyemamu v. Cote*

"Wherever its doctrinal roots may lie, the 'ministerial exception' is well entrenched; it has been applied by circuit courts across the country for the past thirty-five years." *Rweyemamu*

*v. Cote*, 520 F.3d 198, 206 (2d Cir. 2008). In *Rweyemamu*, the Second Circuit adopted this exception to Title VII claims as a doctrinal requirement under the religious freedom clauses of the First Amendment. *Id.* at 207. The *Rweyemamu* Court outlined the following propositions this exception supports: "(1) Title VII … [is] not inapplicable to religious organizations as a general matter; (2) [the Court] will permit lay employees—but perhaps not religious employees—to bring discrimination suits against their religious employers; and (3) even when we permit suits by lay employees, we will not subject to examination the genuineness of a proffered religious reason for an employment action." *Id.*

The Second Circuit made clear that "the term ministerial exception is judicial shorthand, but like any trope, while evocative, it is imprecise." *Id.* at 206. The exception extends beyond just ministers of the Christian faith, but reaches other faiths as well."[3] *Id.* at 206-07. The Supreme Court recognized the ministerial exception as well:

> "Since the passage of Title VII of the Civil Rights Act of 1964 … and other employment discrimination laws, the Courts of Appeals have uniformly recognized the existence of a "ministerial exception," grounded in the First Amendment, that precludes application of such legislation to claims concerning the employment relationship between a religious institution and its ministers. We agree that there is such a ministerial exception."

*Hosanna-Tabor Evangelical Lutheran Church and School v. E.E.O.C.*, 565 U.S. 171 (2012).

Furthermore, district courts in this Circuit have interpreted *Rweyemamu* to permit the "possibility that some employment-discrimination claims by ministers might not be barred if excessive entanglement could be avoided in the particular case." *Fratello v. Roman Catholic Archdiocese of New York*, 863 F.3d 190, 203-04 (2d Cir. 2017). *See, e.g., Rojas v. Roman*

---

[3] The *Rweyemamu* Court cited to several cases that applied the exception to an organist/music director, a press secretary, a director of music ministries, and to staff of a Jewish nursing home and therefore barred plaintiffs' claims. *See Tomic v. Catholic Diocese*, 442 F.3d 1036 (7th Cir. 2006); *Shaliehsabou v. Hebrew Home of Greater Wash., Inc.*, 363 F.3d 299 (4th Cir. 2004); *Alicea–Hernandez v. Catholic Bishop*, 320 F.3d 698 (7th Cir. 2003); *EEOC v. Roman Catholic Diocese*, 213 F.3d 795 (4th Cir. 2000).

*Catholic Diocese of Rochester,* 557 F.Supp.2d 387, 398 n.8 (W.D.N.Y. 2008) ("interpret[ing] th[e] holding [of *Rweyemamu*] to mean that, in this Circuit, the ministerial exception does not necessarily apply to claims involving the hiring or firing of a minister, unless the hiring or firing involves issues of a religion"); *Redhead v. Conference of Seventh-Day Adventists,* 566 F.Supp.2d 125, 132 (E.D.N.Y. 2008) (concluding that "an examination not just of [the] plaintiff's function [was] required, but also of the nature of [her Title VII] claim" to determine whether "the dispute in this case is such that its resolution inevitably will ... impermissibly entangl[e] the court in matters of religious doctrine")

## 1. CUI's Position as a Religious Organization

Title VII "exempts religious organizations from [its] prohibition against discrimination in employment on the basis of religion." *Corp. of the Presiding Bishop of the Church of Jesus Christ of Latter–Day Saints v. Amos,* 483 U.S. 327, 329 (1987); *see* 42 U.S.C. § 2000e-1. "Religious organizations" may include religious schools, hospitals, and corporations. *Penn v. New York Methodist Hospital,* 884 F.3d 416 (2d Cir. 2018). In *Penn,* the Second Circuit ruled that "a religiously affiliated entity is a 'religious institution' for purposes of the ministerial exception whenever that entity's mission is marked by clear or obvious religious characteristics." 884 F.3d 416. The *Penn* Court listed, though declined to adopt, the Third Circuit's factors to determine if an entity is a religious institution:

> (1) whether the entity operates for a profit, (2) whether it produces a secular product, (3) whether the entity's articles of incorporation or other pertinent documents state a religious purpose, (4) whether it is owned, affiliated with or financially supported by a formally religious entity such as a church or synagogue, (5) whether a formally religious entity participates in the management, for instance by having representatives on the board of trustees, (6) whether the entity holds itself out to the public as secular or sectarian, (7) whether the entity regularly includes prayer or other forms of worship in its activities, (8) whether it includes religious instruction in its curriculum, to the extent it is an educational institution, and (9) whether its membership is made up by coreligionists.

*Id.* at n.2 (citing *LeBoon v. Lancaster Jewish Cmty. Ctr. Ass'n,* 503 F.3d 217, 226 (3d Cir. 2007)).

Although the Second Circuit has not outlined specific "religious characteristics" to determine if an entity is a religious organization, the Court will consider the above cited factors to determine if CUI qualifies. CUI is a non-profit organization and works to support student leadership organizations at universities. ECF Nos. 1, 11; Ex. D, 14. CUI's Articles of Incorporation states its purpose is "to operate as a religious evangelistic ministry". ECF No. 11, Ex. D. Though the organization is supported by individual donors, it is unclear whether, directly or indirectly, CUI is also supported by a church or whether a church is represented on the Board. Therefore, as indicated by its title and stated purpose, CUI holds itself out as a religious non-profit organization. Thus, the Court finds that CUI is a religious organization within the meaning of 42 U.S.C. § 2000e-1.

### 2. Plaintiff's Position as a Minister

The more critical question is whether or not Plaintiff is considered a minister within the ministerial exception to Title VII. The First Amendment "does not tolerate a judicial remedy for any minister claiming employment discrimination against his or her religious group, regardless of the group's asserted reason (if any) for the adverse employment action." *Fratello,* 863 F.3d at 203-204. As a result, "whether the ministerial exception bars employment-discrimination claims … depends entirely on whether the employee qualifies as a 'minister." *Id.* The Supreme Court explained that "[t]he members of a religious group put their faith in the hands of their ministers …" and "[r]equiring a church to accept or retain an unwanted minister … intrudes upon more than a mere employment decision. [It] infringes the Free Exercise Clause…" *Fratello,* 863 F.3d at 201, citing *Hosanna-Tabor,* 565 U.S. at 188.

To determine whether a religious organization's employee was a minister, the *Hosanna-Tabor* court relied on several factors, including: (1) the employee's title; (2) whether the employee was held out by the employer as a minister ("the substance reflected in that title"); (3) whether the employee held himself or herself out as a minister ("his or her own use of that title"); and (4) the employee's job responsibilities (whether they are religious in nature). *Id.* at 190-95[4]; *see Fratello*, 863 F.3d at 204-205 (citing *Hosanna-Tabor*, 565 U.S. at 192). Additionally, courts in this circuit have found that the ministerial exception should be viewed on a "sliding scale," in which "the more religious the employer institution is, the less religious the employee's functions must be to qualify." *Penn v. N.Y. Methodist Hosp.*, 158 F.Supp.3d 177, 182 (S.D.N.Y. 2016); *see Musante v. Notre Dame of Easton Church*, No. CIV.A. 301CV2352MRK, 2004 WL 721774, at *6 (D.Conn. Mar. 30, 2004).

Here, Plaintiff's title is "Director of Public Affairs." ECF Nos. 1, 14. This title does not appear in the employment application or in the offer letter—only in the Disciplinary Notice dated August 6, 2015. ECF Nos. 11, Exs. A, B, C. However, his pre-employment documents stated Plaintiff was "joining the ministry of the Christian Union", "part of a ministry", and "join[ing] Christian Union's team". *Id.* Additionally, Defendants stated in the offer letter they "are seeking employees who view their work as a calling," yet do not elaborate further as to what that implies.[5] ECF No. 11, Ex. B.

In *Fratello*, the plaintiff's formal title was "lay principal" which weighed against applying the ministerial exception since it did not suggest membership in the clergy. 863 F.3d at

---

[4] Nevertheless, the Court declined to "adopt a rigid formula for deciding when an employee qualifies as a minister." *Id.* at 190.

[5] *See Hosanna-Tabor*, 565 U.S. at 177. ("'Called' teachers are regarded as having been called to their vocation by God through a congregation" whereas "'Lay' or 'contract' teachers, by contrast, are not required to be trained by the Synod or even to be Lutheran." In that case, the Court found the plaintiff, a called teacher, to be barred by the ministerial exception.)

206. However, the court did not end the inquiry there because "a title," though "surely relevant," is not "by itself" dispositive. *Id.* at 207 (citing *Hosanna-Tabor,* 565 U.S. at 193 (Alito, J., concurring)). It is clear that the "substance of the employees' responsibilities ... is far more important." *Id.* Further, a heavy emphasis on title would "penalize religious groups for allowing laypersons to participate in their ministries and thus create an incentive for religious organizations to bar laity from substantial role[s]" *Id.* Thus, although Plaintiff's title as Director of Public Affairs appears secular, and very well may be, Defendants seemed to consider it a ministerial position with the multiple aforementioned references. In either case, the analysis cannot end here.

As Director of Public Affairs, Plaintiff was not required to meet religious educational requirements and does not claim to have a religious background or education. Additionally, there is nothing in the exhibits or documents referenced that show CUI had an explicit requirement that Plaintiff be a practicing Christian to be considered for the position. Although the employee application contains seemingly religious questions (e.g. applicant's convictions regarding "sexual impurity", financial debts, and the complementarian policy), it does not explicitly require Plaintiff be indoctrinated into any one denomination. ECF No. 11. In *Fratello*, to be considered for the position, the plaintiff was required to be a practicing Catholic, complete a catechist certification program, and "[d]emonstrate proficiency" in "[e]mbody[ing] Christ-centered principles," "[e]ncourag[ing] the spiritual growth ... of each and every student," "[e]xercis[ing] spiritual leadership...," and "promot[ing] Catholic education." 863 F.3d at 208.[6]

---

[6] In *Hosanna-Tabor,* "To be eligible to become a commissioned minister, Perich had to complete eight college-level courses in subjects including biblical interpretation, church doctrine, and the ministry of the Lutheran teacher; ... obtain the endorsement of her local Synod district ... and she had to pass an oral examination by a faculty committee at a Lutheran college." *Hosanna-Tabor,* 565 U.S. at 191.

Unlike the plaintiffs in *Fratello* and *Hosana-Tobar,* Plaintiff claims he was not required to complete any rigorous religious training to be considered for the position of Director of Public Affairs. However, from the Disciplinary Notice it is clear that Defendant required Plaintiff to complete "CU Training" during his employment. ECF No. 11, Ex. C. Though it is not clear what this "CU training" consisted of, Defendants stated in this notice that every employee has completed it and CUI would not make an exception [for Plaintiff]. *Id.* When responding to requests to complete these trainings, Plaintiff stated the trainings were "theological topics" and stated that it "isn't fruitful for me or relevant..." *Id.*

Furthermore, there is insufficient information in the pleadings to determine if Plaintiff held himself out as a minister during his employment. As Director of Public Affairs, Plaintiff was required to raise funds throughout the Northeast and to act as the liaison to CUI's donors. Compl. ¶ 16. However, whether Plaintiff was required to spread the Defendants' religious message or purpose is unclear. Clearly, however, Plaintiff did not hold himself out as a religious leader or a physical representation of Defendants' religious beliefs. *See Fratello,* 863 F.3d at 208 (where plaintiff "personif[ied] the schools beliefs", "presented herself to the School community and the public as a spiritual leader[,]" "led school prayers, conveyed religious messages in speeches and writings," and "expressed the importance of Catholic prayer and spirituality in newsletters to parents.")

In response to Defendants' multiple requests for Plaintiff to complete the aforementioned CU trainings, Plaintiff responded that "the required readings aren't areas of interest," "they are for faith development," "they seem to be theological topics that are interest to Matt, not me...I am not here to learn theology..." ECF No. 11, Ex. C. Evidently, Plaintiff did not see his role as religious in nature. Further, when Plaintiff's supervisor, Carol Fausnaught, told him that she

would pray for him while he was in the hospital, he responded, "I didn't ask you to pray for me." *Id.* Thus, Plaintiff's personal views seem to be at odds with any religious purpose the Defendants promote.

Lastly, courts have held that "the most important consideration … is whether, and to what extent, the plaintiff performed important religious functions …" *Fratello,* 863 F.3d at 208-209 (citing *Hosanna-Tabor,* 565 U.S. at 192). Here, Plaintiff's job responsibilities appear to have centered solely on raising funds for the organization and dealing directly with donors. ECF No. 1.[7] The offer letter states the Plaintiff would be "cultivating donors and prospects in the northeast." ECF No. 11, Ex. B. Additionally, in his performance review from 2014-2015, Fausnaught stated, "I need [plaintiff] to focus on raising funds not on unrelated organizational issues." ECF No. 11, Ex. C.

Furthermore, not only did the plaintiff in *Fratello* perform a long list of religious functions as head of a Catholic school, she was also evaluated on the quality of that performance. *Id.* at 209. For example, "[h]er supervisors and faculty commended her … for "setting a good example as a religion leader" and "making religious values … the focus of life at the School" (among other religious praises). *Id.* Her religious job duties, as well as her performance evaluation regarding them, weighed heavily in favor of the *Fratello* Court's application of the ministerial exception. *Id.* Here, Plaintiff's performance evaluation centered on his alleged lack of fundraising success, workplace attitude, and timeliness of work activities. ECF No. 11, Ex. C. Apparently, he was not evaluated on any religious activity. *See Fratello,* 863 F.3d at 209. In the disciplinary document, CUI states Plaintiff had "not made progress generating additional revenue

---

[7] As explained above, Plaintiff was assigned to a task force to investigate an incident sounding in racial discrimination which caused donors to withhold funds. ECF Nos. 1, 14. This task seems to have been entirely secular.

from [his] territory," "progress adding new donors has been extremely limited," and that Plaintiff

needs to "demonstrate a professional attitude towards [his] required work and [his] colleagues."

ECF No. 11, Ex. C.

Therefore, viewing the facts in light most favorable to Plaintiff, the Court finds that

Plaintiff is not a "minister" and, thus, CUI is not entitled to the ministerial exception for the

purposes of this motion.[8]

### 3. CUI's "Complementarian" Policy

Plaintiff alleges his employment was terminated for opposing Defendants' discriminatory

policy against women. This cause of action, sometimes referred to as association discrimination

and termination, involves a plaintiff claiming that his or her employment was terminated for

opposing discriminatory practices by their employers that were not directed at them. *See*

*Kauffman v. Maxim Health Care Servs., Inc.,* No. 04-CV-2869, 2006 WL 1983196, at *3

(E.D.N.Y. July 13, 2006) (stating there is a "wealth of support in the prior decisions of the courts

in this Circuit and our highest Court for recognizing these types of claims.") Courts have

concluded that "the preclusion of such claims would be inconsistent with the "express

Congressional intent behind Title VII[.]" *Id.* (citing *Johnson v. Univ. of Cincinnati,* 215 F.3d

561, 573-74 (6th Cir. 2000)).

In *Johnson,* after reviewing an African-American male's claim alleging that the

defendants discriminated against him because he advocated for women and minorities, the court

held that in order to state a cognizable Title VII claim, "the plaintiff himself need not be a

---

[8] In *Fratello,* the district court could not determine whether the plaintiff was a minister as defined by the exception and allowed limited discovery to answer that question. *Fratello v. Roman Catholic Archdiocese of New York,* 175 F. Supp. 3d 152, 161 (S.D.N.Y. 2016), *aff'd sub nom. Fratello,* 863 F.3d 190. After the discovery period both sides moved for summary judgement and the court ruled in the defendants' favor. *Id.* The Second Circuit later affirmed the lower court's decision. *Fratello,* 863 F.3d at 210.

member of a recognized protected class; he need only allege that he was discriminated on the basis of his association with a member of a recognized protected class." *Id.* (citing *Johnson,* 215 F.3d at 572-74.)[9] Further, courts in this Circuit have found such causes of action to be cognizable. *Id.* at *4; *See De Matteis v. Eastman Kodak Co.,* 511 F.2d 306 (2d Cir. 1975).[10] Therefore, a "broad reading of Title VII's 'aggrieved person' language... is consistent with the purpose and intent of these statutes. *Kauffman,* 2006 WL 1983196 at *4.

### 4. Plaintiff's Opposition to CUI's "Complementarian" Policy

Under Title VII § 2000e-3(a) (the opposition clause), "a plaintiff engages in a protected activity when he or she opposes an employment practice made unlawful under the provisions of Title VII." *Id.* at *5. Such activity can include informal complaints to management, participation in formal protests, and support of fellow employees who file formal charges. *Sumner v. United States Postal Service,* 899 F.2d 203, 209 (2d Cir.1990). A crucial factor is that the "practice complained of need not necessarily be illegal under Title VII; a cause of action is stated so long as plaintiff possessed a 'good faith, reasonable belief that the underlying challenged actions of the employer violated the law.'" *Cooper v. N.Y. Dep't of Labor,* No. 1:14–CV–0717, 2015 WL 5918263 at *6 (N.D.N.Y. October 9, 2015) (quoting *Manoharan v. Columbia Univ. Coll. of Physicians & Surgeons,* 842 F.2d 590, 593 (2d Cir.1988)).

The Second Circuit has shed light on "what extent an employee's complaints of discrimination are protected activities under the opposition clause when that employee's job

---

[9] The court, in dicta, explained that the protected class member status would be "imputed" [to the plaintiff] in such cases. *Id.* at 575.

[10] The Second Circuit held that "a white person who has suffered injury to some legally cognizable interest as a result of '... trying to vindicate the rights of [non-white] minorities ...' has standing to sue for a violation of [Section 1981]"). *Id.* (citing *Sullivan v. Little Hunting Park,* 396 U.S. 229, 90 S.Ct. 400, 24 L.Ed.2d 386 (1969). The *De Matteis* Court also pointed out that "[a]lthough the [Supreme Court] referred explicitly to [section]1982 in setting out the rationale for its position... it did not limit its holding on the standing issue to that section of the Civil Rights Act. *Id.*

responsibilities involve preventing and investigating discrimination…" *Id.* In *Littlejohn v. City of New York,* 795 F.3d 297 (2d Cir.2015), the Second Circuit stated that,

> "[t]o the extent an employee is required as part of her job duties to report or investigate other employees' complaints of discrimination, such reporting or investigating by itself is not a protected activity under § 704(a)'s opposition clause… But if an employee—even one whose job responsibilities involve investigating complaints of discrimination—actively "support[s]" other employees in asserting their Title VII rights or personally "complain[s]" or is "critical" about the "discriminatory employment practices" of her employer, that employee has engaged in a protected activity under § 704(a)'s opposition clause."

*Id.*

Here, Plaintiff not only reported complaints of discrimination as part of the task force; Plaintiff was personally complaining and was personally criticized Defendants' employment practices. Plaintiff was tasked with investigating an incident alleged to involve the mistreatment of women of color. After speaking with those involved, Plaintiff expressed his own personal views that criticized his employer's discriminatory practices. Similarly, the plaintiff in *Littlejohn* "opposed an unlawful practice under Title VII because she 'was not simply conveying others' complaints of discrimination to [her supervisors] or alerting them to Title VII's mandates; she was complaining about what she believed was unlawful discrimination in the personnel decision-making process[.]'" *Id.* at *7 (citing *Littlejohn,* 795 F.3d at 319). Thus, although Plaintiff conveyed others' complaints to management and warned that CUI may be violating employment discrimination laws, he was motivated to express his concerns to management and the Board about what he believed to be unlawful discrimination against women in CUI's employment policies. Therefore, Plaintiff's Complaint properly alleges CUI terminated his employment for engaging in protected activity.

### 5. CUI's First Amendment Protections

The Court must now determine if CUI's alleged sexually discriminatory policy is protected by the First Amendment. The Establishment Clause prohibits "excessive government entanglement with religion." *Lemon v. Kurtzman*, 403 U.S. 602, 613, 91 S.Ct. 2105, 29 L.Ed.2d 745 (1971) (internal quotation marks and citation omitted). The Free Exercise Clause protects a "church's right to decide matters of governance and internal organization. *Rweyemamu,* 520 F.3d at 208 (quoting *Petruska*, 462 F.3d at 311). As such, courts cannot hinder a religious institution's right to select who performs its spiritual functions. Accordingly, in this case, the relevant question with respect to Plaintiff's claims is whether enforcing Title VII's anti-discrimination provisions against CUI's "complementarian policy" will run afoul to the First Amendment.

Plaintiff alleges he was terminated for opposing CUI's "complementarian" policy. Specifically, he complained that the policy was sexually discriminatory because it prevented women from serving as directors in CUI's ministry and, thereafter, CUI retaliated against him for expressing this anti-religious view. However, the alleged facts in Plaintiff's Complaint suggest that CUI's "complementarian" policy, which reserves executive positions for men, reflects its right to choose who performs certain religious roles within the organization. Therefore, in this case, the Free Exercise Clause bars the Court from asserting Title VII's secular sensibilities on who CUI allows to perform its highest religious roles.

Furthermore, Title VII's anti-retaliation provision does not apply when the basis for the alleged retaliation are an employee's objections to his or her employer's religious discrimination. Title VII's anti-retaliation provision, 42 U.S.C. § 2000e-3(a), shares a subchapter with Section 702, which provides, in relevant part, that "[t]his subchapter shall not apply to . . . a religious corporation . . . with respect to the employment of individuals of a particular religion to perform work connected with the carrying on by such corporation . . . of its activities." 42 U.S.C.A. §

2000e-1(a). Essentially, Title VII "permits religious organizations to advance their religious missions by discriminating based on religion in employment," and, where a retaliation claim is based on complaints directed toward that permissible discrimination, Title VII's anti-retaliation provision "does not apply." *Lown v. Salvation Army, Inc.*, 393 F. Supp. 2d 223, 246, 254 (S.D.N.Y. 2005).

Accordingly, applying Title VII's discrimination and retaliation provisions to CUI's "complementarian" policy violate the Free Exercise Clause. For that reason, Plaintiff's Title VII anti-retaliation claim must be dismissed.

## II.     Plaintiff Fails to State A Cognizable Claim in Count IX

Plaintiff also asserts a claim based on CUI's alleged "violation of Title VII requirements of each Ivy League University where it operates student leadership organizations." Compl. ¶¶ 75-76. This claim presents two issues: 1) whether the Title VII's standing provision affords Plaintiff the right to sue on behalf of private universities; and 2) whether Plaintiff adequately stated a cognizable claim.

To demonstrate constitutional standing, a "plaintiff must show an 'injury in fact' that is 'fairly traceable' to the defendant's conduct and 'that is likely to be redressed by a favorable judicial decision.'" *Bank of Am. Corp. v. City of Miami, Fla.*, 137 S. Ct. 1296, 1302, 197 L. Ed. 2d 678 (2017) (quoting *Spokeo, Inc. v. Robins*, 136 S. Ct. 1540, 1547, 194 L. Ed. 2d 635 (2016), as revised (May 24, 2016)). Plaintiff's must also have "statutory standing." *Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 572 U.S. 118, 12, 128 n.4, 134 S. Ct. 1377, 188 L.Ed.2d 392 (2014). To make this determination, courts must: 1) decide "whether the statute grants the plaintiff the cause of action that he asserts;" and 2) presume a statute provides a cause of action

"only to plaintiffs whose interests fall within the zone of interests protected by the law invoked." *Id.*

Title VII's standing provision, codified at 42 U.S.C. § 2000e-5, authorizes civil suits by a "person claiming to be aggrieved by an alleged unlawful employment practice." Congress passed Title VII with the intent to eradicate employment discrimination from the national economy. *See EEOC v. Fed. Express Corp.*, 268 F. Supp. 2d 192, 198 (E.D.N.Y. 2003). To accomplish this, courts have liberally interpreted Title VII's standing provision to allow for overlapping enforcement. *Id*; *see also Gonzalez v. N.Y. State Dep't of Corr. Servs. Fishkill Corr. Facility*, 122 F.Supp.2d 335, 347 (N.D.N.Y. 2000) (recognizing wife's Title VII retaliation claim on account of husband's complaints of discrimination). In addition, earlier cases within the Second Circuit reflect the view that these types of third-party claims are cognizable. *See Kauffman,* 2006 WL 1983196 at *4 (recognizing plaintiff's right under Title VII to assert claims of retaliation and discrimination for opposing defendant's alleged policy against the hiring of non-whites and women); *Whitney v. Greater New York Corp. of Seventh-Day Adventists*, 401 F.Supp. 1363, 1367 (S.D.N.Y. 1975) (holding if a white employee is discharged because her employer condemned a social relationship between the white woman and a black man, the employee's race is as much a factor in the decision to fire her as her friend's race).[11]

Here, Plaintiff's claim falls outside the "zone of interests" protected by Title VII. *See Lexmark,* 572 U.S. at 126, 134 S.Ct. 1377. Unlike Plaintiff's retaliation claim or the claims in the cases cited above, Count IX is ambiguous. The Complaint fails to clarify who CUI's policy has

---

[11] The Supreme Court has also permitted a white plaintiff to bring a claim under Title VII alleging that he was injured by the defendant's racially discriminatory housing practices. *See Trafficante v. Metropolitan Life Ins. Co.*, 409 U.S. 205, 212 (1972). *See also De Matteis*, 511 F.2d 306, 312 (holding that "a white person who has suffered injury to some legally cognizable interest as a result of '... trying to vindicate the rights of [non-white] minorities ...' has standing to sue for a violation of [Section 1981]").

harmed. In the event he brings this claim on behalf of Ivy League Universities, Plaintiff fails to identify a single University policy CUI has violated. In the event he brings this claim on behalf of Ivy League University students, Plaintiff fails to identify a single student or student group CUI has harmed. Essentially, there is no injury in this claim that a favorable decision will likely redress. Therefore, despite the Court's liberal interpretation of the standing provision, the Court cannot view Plaintiff as the "aggrieved person" Congress intended to protect under Title VII.

Moreover, even if Plaintiff proved standing, the Complaint fails to state a claim. As explained above, Plaintiff fails to identify a party aggrieved by CUI's policy. According to the Complaint, Plaintiff is neither an Ivy League University employee nor student. He is not associated with any student group, nor is he associated with CUI. Furthermore, Plaintiff has failed to identify how CUI's "complementarian" policy impacted these campuses in any fashion. Accordingly, Plaintiff's Count IX claim is purely based on statements too "conclusory" for the Court to allow it to survive this motion to dismiss. Therefore, Defendants' Motion to Dismiss Count IX of Plaintiff's Complaint is GRANTED

### III.  Plaintiff's Remaining State Law Claims

Under 28 U.S.C. § 1367(c)(3), courts may exercise supplemental jurisdiction over state law claims if it has "dismissed all claims over which it has original jurisdiction." However, the Second Circuit advises against exercising supplemental jurisdiction in such a situation: "[I]f the federal claims are dismissed before trial, even though not insubstantial in a jurisdictional sense, the state claims should be dismissed as well." *First Capital Asset Mgmt., Inc. v. Satinwood, Inc.*, 385 F.3d 159, 183 (2d Cir. 2004) (quoting *Castellano v. Bd. of Trustees*, 937 F.2d 752, 758 (2d Cir. 1991)).

Having dismissed Plaintiff's Title VII claim, and there being no other basis for federal jurisdiction over this case, the Court declines to exercise its supplemental jurisdiction over the state law claims. *See* 28 U.S.C. § 1367(c)(3).

## CONCLUSION

For the reasons stated above, Defendants' Motion to Dismiss Plaintiff's complaint is **GRANTED**.

**SO ORDERED.**

**Dated:**    **March 29, 2019**
          **New York, New York**

HON. ANDREW L. CARTER, JR.
United States District Judge